(No. 2199—

HARRY POSTLEWAIT, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed November 10, 1936.*

GROSSMAN, GROSSMAN & SISSMAN, for claimant.

OTTO KERNER, Attorney General; JOHN KASSERMAN and CARL DIETZ, Assistant Attorney Generals, for respondent.

MR. JUSTICE YANTIS delivered the opinion of the court:

In a complaint filed June 29, 1933 claimant alleges that while he was employed as an attendant at the Chicago State Hospital at Dunning, Illinois on February 16, 1933, he was

assaulted by a negro inmate who struck him violently in the left eye, causing claimant to immediately lose the sight thereof and resulting in the complete loss of vision in said eye. Claimant avers that he received compensation for two weeks after said assault and he seeks an award for whatever amount of compensation for loss of time and loss of vision he may be entitled to, under the Workmen's Compensation Laws provided by the statutes of the State of Illinois.

Respondent denies that claimant has suffered any serious impairment of vision in any accident arising out of and in the course of his employment and denies that claimant is entitled to any award herein.

Claimant testified that on February 16, 1933 while in the course of his duties as an attendant at said hospital about 3 o'clock in the morning, he was struck in the left eye by the patient, one William Thomas; that he was immediately taken by a Mrs. Lochy from that portion of the institution to the hospital division, and an ice pack was put on his eye; that the hospital doctors called on him and that he remained in the hospital for about two weeks; that about the 1st day of March he called on Dr. Noble. No other witnesses were examined as to the accident itself or the circumstances surrounding same, but four doctors testified as to examinations made by them of claimant's eyes; two, i. e. Dr. Nathan H. Fox and Dr. Samuel Brown testifying on behalf of respondent, and Dr. Wm. L. Noble and Dr. Daniel W. Eiss being called by claimant.

After his accident claimant remained at the State Institution at Dunning until the 27th day of February, 1933 when he was sent to the Illinois Eye and Ear Infirmary, where he was examined by Dr. Fox. He was again examined by Dr. Fox on March 8, 1933. He was also examined by Dr. Samuel Brown at the Infirmary on December 19, 1933. Claimant was for some reason not satisfied with the examination by Dr. Fox and was examined by Dr. William L. Noble the fore part of March, 1933 and on two or three other occasions thereafter. Dr. Daniel W. Eiss of Chicago examined claimant in consultation with Dr. Noble on the 15th day of March, 1933. He again made an examination about December 17, 1933 just prior to becoming a witness at the hearing. Dr. Noble testified that at his first examination in March he made the routine

examination of patient to see whether he had any vision in the eye or not and that the patient returned two or three times thereafter; that the right eye had practically normal vision, but that the inside of the left eye was cloudy and that he could hardly make out the lines of the macula or the center part of the retina; that in his opinion the claimant is without the faculty of vision in the left eye in the sense of distinguishing objects; that the loss of eye sight in the left eye is permanent and that in his judgement the eye ball itself is progressively degenerating. Dr. Noble further testified on cross-examination that the cloudiness and also the wiping out of the lines of the macula could be explained by trauma and that it could also be explained by other conditions; that he would not say that it was trauma but that it could be caused by trauma. Dr. Noble subjected the patient to malingering tests without producing any evidence of increase of vision of the left eye.

Dr. Daniel W. Eiss testified that he examined the claimant for the first time, in consultation with Dr. Noble, about the 15th of March, 1933. He obtained a history of the case from the claimant and then made an objective examination of patient's left eye. At that time he said he found the temple side of the eye discolored due to some previous subcutaneous hemorrhage; that this condition later disappeared. A further examination was made of the interior of the eye ball, the cornea, the macula and the optic nerve or optic disc. This witness stated that the patient could apparently see only about five feet away with the left eye but could not distinguish objects; that the witness then resorted to the malingering test by obscuring first the right eye and giving the patient the idea that he was seeing with the right eye when in fact he was seeing with his left, then reversed the lenses and that he found the patient was not malingering. Dr. Eiss testified that there is a softness to the left eye ball; that the degenerative process is a very slow one, but that same may in a few years extend to and affect the good eye; that the patient can see light but cannot distinguish objects and that from an industrial viewpoint there is a total loss of use of the left eye.

Dr. Nathan H. Fox, who has been connected with the Illinois Eye and Ear Infirmary in Chicago since 1921, testified that in his first examination of plaintiff on February 27, 1933

he received the statement of plaintiff that he could see only shadows with his left eye; that he then made a physical examination of both eyes; found no evidence of external injury to the left eye, the cornea and tension were normal and the pupil was of normal size and shape, reacting normally to light and accommodation; that he could find no pathology to explain the loss of sight in the left eye and that there was no evidence of trauma at that time. That the patient was insistent upon receiving a certificate at that time that he had lost the sight of the left eye; that he declined to give such letter and requested the patient to return for further examination; that the patient later returned on March 8, 1933; that another physical examination was made of his eyes at that time and same were found to be normal; that at that time, having become suspicious of the patient, a malingering test was given by apparently testing the lenses which he was then using in glasses that he was then wearing; that a plus 16 lens was placed before the right eye and a minus 1/4 lens was placed before the left eye. The lens placed on this test before the right eye is a very powerful lens having plus 16 diopters. A lens of that nature when placed before a normal eye will practically abolish sight at a distance of twenty (20) feet inso-far as the reading of chart letters is concerned. The minus 1/4 lens placed before plaintiff's left eye is practically like a window glass and would not interfere with the eye sight at all; that the patient was apparently not aware of the type of lenses that were being used. This test was given a second time and was again repeated by an Interne, Dr. F. M. Whitsell. The patient read the chart at 20/30 which is close to normal; such reading of necessity being done with the left eye, and that as a result of such examination the witness was of the opinion that the patient was malingering, and that he had sustained no loss of vision from the injury complained of. Dr. Fox further testified that the retina was normal and the tension of the eye was normal on the occasion of his first examination, and that on the second examination the eye ball was found to be normal.

Dr. Samuel Brown, a resident Ophthalmologist at the Illinois Eye and Ear Infirmary, testified that he examined plaintiff on December 19, 1933; that he gave him a subjective and then an objective test; that the glasses which plaintiff

was then wearing indicated some fault in vision and corrected his unaided vision somewhat; that tension of both eyes was normal; that the right pupil was four millimeters in size and the left pupil was seven and one-half by eight millimeters in size; that this condition of the left pupil indicated to him that some drug might have been used in that eye to dialate the pupil; that the latter reacted sluggishly to light, and that he then subjected the patient to a malingering test, the description of same showing it to be similar to that employed by Dr. Fox; that the patient was apparently unaware of the change that had been made in the lenses used in the test and that he was able to read the .chart 20/50, thereby indicating to the witness that the patient was a malingerer; that there was no indication of trauma to the eye ball or eye socket at the time of his examination. This witness further testified that the sluggishness of the pupil of the patient's eye could have been due to the use of drugs. Dr. Brown testified that he found no degenerative or inflammatory process of any kind.

It is impossible to reconcile the testimony of the several doctors. Their examinations, however, were not made in unison, but at different times, and they have testified as to plaintiff's condition as they observed it on the occasion of their respective examinations. If one reputable witness testifies to having seen and observed a definite thing occur it is immaterial how many others may not have seen or observed such occurrence. In the present case two reputable responsible eye specialists have testified positively to the fact that the claimant, when subjected to malingering tests, was found to be able to read with no uncertainty, and that in their opinion the patient was malingering and that the eye in question had not suffered loss of vision due to any trauma. The fact that on other occasions plaintiff submitted himself to examination by other physicians, and under his condition at such times such other physicians were unable to detect any signs of malingering does not sufficiently negative the proof that exists against him.

The burden is upon the plaintiff to establish proof that the loss of vision of his eye was due to an accident which occurred in the course of and growing out of his employment. The record is not sufficient to support such claim and an award is denied and the claim dismissed.